Matter of R.B. v I.S. (2024 NY Slip Op 50228(U))

[*1]

Matter of R.B. v I.S.

2024 NY Slip Op 50228(U)

Decided on February 28, 2024

Family Court, Richmond County

McFarland, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 28, 2024
Family Court, Richmond County

In the Matter of a Proceeding for Custody R.B., Petitioner/Respondent,

against
I.S., Respondent/Petitioner.

Docket No. V-1268-20/22A

Petitioner Father/Respondent Father
Pro Se
Attorney for Respondent Mother/Petitioner Mother
Ian Berliner, Esq. 
42 Richmond Terrace, Ste. 300
Staten Island, NY 10301
(718) 448-6045
Attorney for the Children
Nicholas Murgolo, Esq.
400 St. Mark's Place
Staten Island, NY 10301
(929) 484-9884

Janet L. McFarland, J.

In the matter before the Court, the Petitioner/Respondent, R.B. (hereinafter "father" or "Mr. B.") is seeking a modification of a Parenting Plan order issued by Hon. Samuel Chung of the Superior Court of Washington issued on September 5, 2019, and seeking sole legal and physical custody of the subject children. The Respondent/Petitioner I.S. (hereinafter "mother" or "Ms. S.") is seeking to modify the September 5, 2019 Washington order to suspend Mr. B.'s visitation with the children pending Mr. B.'s completion of a mental health evaluation and anger [*2]management program. Throughout this proceeding, there have been several appearances, extensive motion practice, testimony proffered at trial and documentary evidence admitted. This Court has reviewed all petitions, filings, orders, transcripts carefully and issues the following decision:
RELEVANT PROCEDURAL HISTORY
The parties are the parents of two children, A.B., born XX-XX-XX, and P.B., born XX-XX-XX. The parties were married at the time of the children's births and the parties' marriage was ultimately dissolved on October 12, 2018.
On October 12, 2018, a final order of custody and parenting was issued by Hon. Henry Judson of the Superior Court of Washington (hereinafter "2018 Washington Order".) The 2018 Washington Order granted the mother sole legal and physical custody of the children and granted the father parenting access "every other weekend from Thursday after school (or 7:00 A.M. if no school) to Monday drop off at school (or 7:00 A.M. if no school) and every Thursday from after school (or 7:00 A.M. if no school) to return to school Friday morning (or 7:00 A.M. if no school.) The 2018 Washington Order also granted the father parenting access in which the children would reside with the mother for the first four weeks of summer and then reside with the father for the following three weeks.
On September 5, 2019, the final order of custody and parenting time was modified by Hon. Samuel Chung of the Superior Court of Washington (hereinafter "2019 Washington Order".) The 2019 Washington Order was issued based upon the mother's pending relocation from Washington to New York. The 2019 Washington Order modified the father's parenting access to visitation with the children from after school on Thursday until Monday return to school or 9:00 A.M. if no school, at least one weekend per month during the following months: September, October, November, January, February, March, and May. The father's parenting access in the summer was also modified directing that the children shall reside with the father for six (6) consecutive weeks during the summer, returning to New York on Sunday at 8:00 P.M.
On March 10, 2020, Mr. B. filed the instant petition seeking to modify the 2019 Washington Order as he had relocated from Washington to New York. At that time, Mr. B. was seeking to modify the 2019 Washington Order by reverting to the visitation plan as directed in the 2018 Washington Order.
On May 14, 2020, counsel for the father filed an order to show cause [Motion Seq. #1] seeking to advance the court date for an immediate hearing alleging that the mother had engaged in a deliberate pattern of parental alienation against the father by not allowing additional visitation outside the 2019 Washington Order. On May 28, 2020, the mother filed an affidavit in response to the motion seeking a court appointed attorney.
On June 3, 2020, the attorney for the mother, Ian Berliner, Esq., and the attorney for the children, Rita Kaufman, Esq., were assigned pursuant to New York County Law Article 18-B. The father had retained counsel. On June 18, 2020, parties appeared with their attorneys before Court Attorney Referee Alexandra Byun in Richmond County Family Court. A hear and determine was signed by the parties, issue was joined, and Motion #1 was addressed. Referee Byun indicated that the Court could not decide the motion or assume jurisdiction until there was clarity regarding an ongoing custody matter in Washington.
On July 16, 2020, the father's attorney confirmed that the appeal on the custody matter in Washington was withdrawn but no documentation indicating such was provided on this date. Counsel for the mother indicated that parties were able to work out temporary visitation pending [*3]the jurisdictional issue where the father had parenting time with the children for six weeks in the summer.
On August 27, 2020, Referee Byun issued a temporary order of visitation effective September 10, 2020, granting the father parenting access on alternate weekends from Thursday after school to Sunday at 7:00 P.M. Counsel for the father indicated that the father had amended the petition and counsel was directed by the Court to file the amended petition. The petition amended Mr. B.'s request from visitation to a request for sole legal and physical custody based on alienation. According to the attorney for the children (hereinafter "AFC"), her conversations with the children did not indicate any parental alienation.
On August 28, 2020, Mr. B. filed an amended petition seeking sole legal and physical custody of the children based on allegations of parental alienation by the mother.
On December 21, 2020, the father's attorney filed an order to show cause [Motion Seq. #2] seeking to enforce the 2019 Washington Order granting the father parenting time with the children every year during the school breaks, namely winter recess starting on December 24, 2020, directing the mother to provide the father with all information regarding the children's health providers and educational appointments, and custody of the children pending trial. On December 24, 2020, this Court issued an order granting the father parenting access from December 29, 2020, to January 3, 2021.
On January 21, 2021, counsel for the father submitted a consent to change attorney indicating that the father would be appearing pro se on the matter. A conference was scheduled for this date at which time Mr. B. waived his right to counsel. Since that date, Mr. B. waived his right to counsel and proceeded pro se. On this date, the mother alleged that during the last visit the father had with the children, the father locked the child A.B. in a closet and A.B. was forced to urinate on herself. Based upon the allegations, Referee Byun issued a court ordered investigation (hereinafter "COI") and issued an order for the father to have supervised visits.
On January 28, 2021, parties and counsel appeared to address the COI that was received by the Court. Mr. B. appeared pro se but indicated he was looking for an attorney. In review of the COI, A.B. confirmed the allegations that her father locked her in a closet and was forced to urinate herself to Child Protective Services. Based upon the COI, the Court continued the supervised visits for the children and the father.
On January 28, 2021, Mr. B. filed a motion [Motion Seq. #3] seeking Referee Byun's recusal alleging that no trial was scheduled and that continuous delays on the matter were indicative to Mr. B. of "deep-seated" bias against Mr. B. and further alleged bias by the AFC against males for "siding" with the mother. Mr. B. alleged the mother to be a "liar" and that her attorney, along with the AFC, were perpetuating the parental alienation claiming: "It is crystal clear to me religion, morality, fear of G-d, decency or humanity are not guiding Ms. S., Mr. Berliner, or Ms. Kaufman. Otherwise, they wouldn't fight in such unison. . .against any morsel of children's access to their father. This is between them and their Creator. I pray for their souls, and I hope that one day they will come to realize what they have done."
On February 23, 2021, Motion #3 was heard, and Referee Byun recused herself indicating that while she believed she would have been able to proceed fairly and without bias, one of the father's exhibits in his motion suggested that the father attempted to obtain personal information about the jurist which was deemed a threat. The motion was granted, and the matter was transferred to Hon. Peter Delizzo of Richmond County Family Court.
On March 23, 2021, Mr. B. filed a motion [Motion Seq. #4] seeking to enforce the 2019 [*4]Washington Order specifically as it relates to Spring Recess, vacating the order for supervised visits, and reinstating his unsupervised parenting time. Mr. B. alleged that supervised visitation weakened the natural father-child bond by "instilling the notion of 'daddy being a risk' requiring external monitoring from the almighty state-funded agents". He further argued that because of the 2018 Washington order, the children are used to spending spring break with him and need to spend time with him. On March 25, 2021, the first appearance was held before Hon. Delizzo to address Mr. B.'s Motion #4. The Court advised Mr. B. of his right to counsel or obtain an attorney to which Mr. B. waived his right to counsel. The AFC was not opposed to the relief sought so long as the visits were supervised noting that because of the incident where A.B. was locked in a closet, the children were not willing to have unsupervised visits until Mr. B. apologized to A.B. Mr. B. denied that the incident occurred and argued that the allegations were fabricated by the mother. The Court denied Mr. B.'s relief stating that there has been no change in circumstance since the initial order for supervised visits was issued. Hon. Delizzo subsequently set the matter down for trial for May 25, 2021, to address Mr. B.'s petition.
On May 10, 2021, Mr. B. filed an order to show cause [Motion Seq. #5] seeking an order prohibiting the mother from leaving the jurisdiction until the completion of the case, ordering the mother to surrender the children's passports, and reinstating his unsupervised visits. According to the father's motion, the mother continued to manipulate the court and was now manipulating the visitation agency supervising Mr. B.'s visits with the children by her lack of availability for visits. Mr. B. further argued that the continuation of supervised visits and not conducting a trial amounted to "state-sponsored parental alienation" and that the state was "effectively" taking a side in a civil dispute by not reinstating his visits. According to Mr. B., allowing the mother to leave the jurisdiction, even for vacation, would cause the State of New York to lose "a great of amount of venue."
On May 25, 2021, the Court addressed the motion and granted Mr. B.'s motion in part by issuing an order directing that the mother could not leave the country with the children. During the hearing on the motion, the AFC voiced the children's position and Mr. B. indicated he "did not appreciate the AFC's position" and accused the AFC of playing a game by siding with the mother and not siding with him. The Court admonished Mr. B. indicating that the AFC was the attorney for the children and simply advocating the children's positions. Mr. B. demanded a jury trial to address the issues. The request for a jury trial and the remainder of Mr. B.'s motion were denied. The matter was adjourned for trial on October 6, 2021, and October 7, 2021.
On June 25, 2021, the father filed an order to show cause [Motion Seq. #6] seeking parenting access for six consecutive weeks in the summer. The motion was adjourned to October 6, 2021.
On July 1, 2021, the father filed a notice of motion [Motion Seq. #7] seeking sanctions against the mother for asserting material factual statements that are false and alleging that the statements were made to harass Mr. B.. Mr. B. alleged these statements were made in a child support proceeding in which the mother indicated she did not know the father's address and that the father had accepted a job position which Mr. B. alleged was false.
On August 10, 2021, the father filed a motion for summary judgment [Motion Seq. #8] for sanctions against the mother on the basis that the mother had not submitted any response papers to Motion #7. On August 11, 2021, Motion #7 and #8 were denied on the basis that the relief sought was an issue for disposition.
On August 11, 2021, Hon. Delizzo, issued an order modifying the father's visits to allow [*5]for supervised visits in the community.
On August 20, 2021, Mr. B. filed a motion [Motion Seq. #9] seeking to have a community resource supervise his visits instead of Comprehensive Family Services, the assigned supervisory agency. On September 9, 2021, the Court denied Mr. B.'s motion.
On September 17, 2021, Mr. B. filed a motion [Motion Seq. #10] seeking a jury trial on the custody proceeding. Despite being advised by Hon. Delizzo on May 25, 2021, that Section 143 of the Domestic Relations Law does not allow for jury trials on custody matters, Mr. B. cited Section 143 of the Domestic Relations Law and the Constitution as a basis for a right to jury trial on custody matters. On September 21, 2021, Hon. Delizzo denied the motion stating the motion failed to state a cause of action that would enable the Court to grant the relief sought.
On September 24, 2021, Mr. B. filed a motion [Motion Seq. #11] seeking an in-person trial and permission to audio and video record the trial alleging that the Court would only be able to assess the parties' and witnesses' credibility if the trial were in-person. The motion was scheduled to be heard on October 7, 2021, before Hon. Delizzo.
On September 28, 2021, the father filed an order to show cause [Motion Seq. #12] seeking to adjourn the trial dates of October 6, 2021, and October 7, 2021 until a decision was issued from the U.S. District Court for the Eastern District of New York regarding his application for a jury trial on the instant petition as well as seeking a vacatur of the order for community supervised visits between the father and the children.
On September 30, 2021, Hon. Delizzo recused himself on this matter and the matter was transferred to this Court for all further proceedings. Parties were scheduled to appear for the first time before this Court on October 29, 2021, to address motions #6, 11, and 12. The trial dates of October 6 and 7 were vacated.
On October 1, 2021, Mr. B. filed an order to show cause [Motion Seq. #13] seeking to vacate the supervised visitation order and reinstate the 2018 Washington Order of parenting access or in the alternative assign a different supervisory resource. The motion was adjourned to October 29, 2021, to join Mr. B.'s pending motions.
On October 21, 2021, Mr. B. filed an order to show cause [Motion Seq. #14] seeking to appoint an alternative supervisory resource. The motion was adjourned to October 29, 2021, to join Mr. B.'s pending motions.
On the morning of October 29, 2021, prior to the first appearance before this Court, Mr. B. filed a motion [Motion Seq. #15] seeking this Court's recusal based upon this Court signing an order for the presiding referee in December 2020. During the appearance, this Court offered Mr. B. a legal adviser, however, Mr. B. refused. Given that Motion #15 was received on the day of the appearance, all motions were adjourned for decision on December 7, 2021.
On November 8, 2021, the father filed an order to show cause [Motion Seq. #16] seeking to prevent the mother from having the children receive the COVID-19 vaccine. The motion was adjourned to December 7, 2021, for decision as well as Mr. B.'s remaining motions.
On November 16, 2021, the father filed a notice with this Court requesting the Court to recuse itself and assign the matter "to a Judge whose workload will permit full adherence to the mandate in Section 100.3 (B)(7) of the New York Rules of the Chief Administrative Judge.
On the morning of December 7, 2021, Mr. B. filed another notice with this Court advising that he submitted a formal complaint to the New York State Commission on Judicial Conduct and the Chairman of the New York State Assembly Committee of Children and Families against this jurist.
During the December 7, 2021, appearance, this Court ruled on Mr. B.'s pending motions #6, 11, 12, 13, 14, 15, and 16. Motion #6 was marked off calendar as the matter was moot. Motion #11 was granted in part and denied in part in that the trial would be conducted in person, however, in accordance with the New York State Unified Court System Rules of the Chief Administrative Judge, Part 131, audio and video recording of proceedings is prohibited. Motion #12 was deemed an issue for trial regarding restoring the 2018 Washington Order of Parenting Access. Further the federal action was concluded allowing the matter to proceed to trial. Motion #13 was deemed an issue for trial regarding restoring the 2018 Washington Order of Parenting Access. The motion for the alternative supervisor was denied. Motion #14 was deemed an issue for trial regarding restoring the 2018 Washington Order of Parenting Access. Motion #15 was denied as there was no reason for this Court to recuse itself as the Court deemed it was not biased or prejudiced and could be fair and impartial. Motion #16 was denied with the Court holding that it would not make any medical decisions and would defer to the 2018 Washington Order granting the mother decision making for medical decisions. This Court attempted to schedule trial dates to address Mr. B.'s concerns regarding his parenting time as well as his petitions, however, Mr. B. refused indicating he was awaiting decision from the U.S. District Court for the Eastern District of New York regarding his application for a jury trial on his modification petition.
On December 20, 2021, Mr. B. filed a notice of motion [Motion Seq. #17] to reargue his motion seeking to prevent the mother from having the COVID-19 vaccine administered to the children.
On December 30, 2021, the father filed an order show cause [Motion Seq. #18] seeking to vacate the order for supervised visits, revert visitation back to the 2018 Washington Order, alleging that the order of supervised visitation prolonged the "inhumane and unconstitutional children-father separation, under Jesuitical, typical plausible-deniability pretense of waiting for some kind of 'reparatory' face-off — but clearly aiming to force minor children to become their own father's prosecutors, in the best traditions of atrocious communist regimes, and their innocent father to confess for a non-existent crime — is ungodly, evil, cruel, immoral, and blatantly unlawful" in reference to the children requesting an apology for the incident in which A.B. alleged that her father locked her in a closet and forcing to her to urinate on herself. Mr. B. further argued "It is clearly nothing more than a classical provocation, in which the well-oiled government machine of alienation children from parents has become so proficient in the decades it has been operating. I will not fall for it. I will not bow to tyranny and any of this shameless deceit." Mr. B. also requested the information of the children's medical providers on the basis that the children were evaluated and diagnosed with ADHD without notice to the father.
On January 5, 2022, the father submitted a notice of motion [Motion Seq. #19] seeking to reargue his motion to restore his parenting access to the 2018 Washington Order on the basis that that he will not "confess to a crime [he] did not commit."
On January 17, 2022, this Court denied Motion #17 on the basis that the mother has medical decision making for the children as per the 2018 Washington Order. Motions #18 and #19 were denied as the applications were previously denied and there were no new facts presented.
On February 8, 2022, counsel for the mother filed an order to show cause [Motion Seq. #20] seeking a court order allowing him to return the children's passports to the mother to allow the mother to renew the passports. On February 14, 2022, the father filed an affidavit in [*6]opposition alleging 1) that this Court has no jurisdiction to decide the motion based because the father filed a complaint to the New York State Commission on Judicial Conduct against this Court, 2) that the mother is lying about renewing the passports, and 3) that the mother's attorney was lying about serving the father with the motion.
On February 14, 2022, the Court issued an order on Motion #20 ordering that the mother's passport is to be returned to the mother, but the children's passports remain with the attorney for the children.
On March 17, 2022, the father filed an order to show cause [Motion Seq. #21] seeking an order transferring custody of the children to the father, suspending contact between the mother and the children for a period of three months, and supervised contact between the mother and the children for a year following the three months based on parental alienation. Mr. B. alleged that his "indicated" report on the State Central Registry was overturned after the Administration for Children's Services (hereinafter "ACS") e-mailed the Administrative Law Judge that it would not be presenting any evidence in support of the indicated report. According to Mr. B., despite the children's statements regarding A.B. being locked in a closet and forced to urinate on herself, the fact that the administrative branch overturned the "indicated" report to "unfounded" regarding the ACS investigation into the matter, meant that the children were lying about the allegations.
On March 18, 2022, the father filed a motion [Motion Seq. #22] seeking this Court's recusal based upon Mr. B.'s filing of an FBI complaint against this jurist alleging that the Court was engaging in a "Cash for Kids" ring based upon this Court continuing an order for supervised visits between the father and the children, assigning the mother's attorney and the attorney for the children to other cases pending before this Court pursuant to Article 18-B, and being a member of a bar association for women on Staten Island.
On March 18, 2022, the father filed a motion [Motion Seq. #23] seeking immediate removal of the mother's attorney and the attorney for the children. Mr. B. alleged that the attorney for the children was destroying the children by "pitting them against me, their father." Mr. B. further argued that it "is hard for me to imagine that, after committing such indelible sins against most basic moral laws, [the AFC] has any morsel of humanity and godliness left in her suddenly self-proclaimed. . .Jewish soul." Mr. B. further alleged that the mother's attorney should be removed for allegedly lying to the Court regarding service of a motion, despite Mr. B. being served timely and replying to said motion. According to Mr. B., both attorneys should be removed from the case and be placed under FBI investigation.
On May 10, 2022, with all parties and counsel present, the Court denied Mr. B.'s Motion #21 indicating that the transfer of custody was an issue for trial and scheduled trial for October 12, 2022, October 14, 2022, and October 27, 2022. Motion #22 was denied as there was no reason for this Court to recuse itself. This Court further indicated that it was not biased and can be fair and impartial. Neither Judiciary Law Section 14 nor Section 100.0(E)(1) of the Rules Governing Judicial Conduct mandate disqualification under the circumstances noted by the father. Rather, the Committee has previously advised judges that absent a showing of prejudice, a jurist can continue to preside over cases even if they were being sued in their official capacity in another matter by one of the parties. "Any rule requiring automatic recusal under such circumstances could enable disgruntled litigants to engage in 'judge shopping'". The Court reserved decision on Motion #23 allowing counsel to respond. This Court notes that there was no objection to the date selection for trial on this date.
On June 21, 2022, the father filed an order to show cause [Motion Seq. #24] seeking recusal of this jurist and cancellation of the children's in camera pending a full determination on this jurist's recusal, full execution of removal of the mother's attorney and the attorney for the children, and decision on a pending appeal of the May 10, 2022, decision on Motion #21 and #22. According to the father, there "is zero evidentiary value to anything the children could say." On June 21, 2022, the Court denied the relief seeking to cancel the children's in camera interview.
On June 24, 2022, the father filed a motion [Motion Seq. #25] seeking recusal of this Court based upon Mr. B. filing a complaint against this jurist to the mayor of the City of New York, this Court refusing to remove the attorney for the children and the mother's attorney, and based upon Mr. B. posting a video on social media denouncing this jurist and creating a social media group to remove this jurist alleging, "This is not a serious court, this is a circus." According to Mr. B., this jurist's "disdainful facial expressions and frequent smirks indicate her deep-seated hatred and animosity toward me for daring to stand up." The motion was denied and based upon what it deemed as frivolous motion practice, the Court issued an order that neither pay may file any further motions absent leave of the Court.
On October 6, 2022, Mr. B. requested an adjournment of the October 12, 2022, and October 14, 2022 trial dates as they were religious holidays he observed. This Court vacated the two trial dates and trial was scheduled to commence on October 27, 2022.
On October 27, 2022, the mother filed a modification petition seeking this Court to modify the 2019 Washington Order and only grant the father supervised visits. Trial was set to commence on this date; however, Mr. B. e-mailed this Court indicating that he was rushed to the hospital that day. The matter was adjourned to November 15, 2022, wherein new trial dates were selected for March 14, 2023, and May 9, 2023. Also on this date, this Court vacated Mr. B.'s supervised visitation order and granted the father parenting access every Sunday from 12:00 P.M. to 6:00 P.M.
On November 15, 2022, the father, without permission from this Court, filed another motion [Motion Seq. #27] for recusal of this jurist based upon the father observing this jurist attend a Catholic Mass that the father was protesting. The motion was denied.
On December 12, 2022, the father disregarded this Court's June 24, 2022, order and, without permission, filed an order to show cause [Motion Seq. #27] seeking the Court to find the mother guilty of criminal contempt, incarceration of the mother, and custody of the subject children based upon the children missing a visit on December 4, 2022. On that same day, the father filed another order to show cause [Motion Seq. #28] seeking custody of the children, that the mother not be allowed any contact with the children for 90 days, "in order to allow the children to detox from the poisonous indoctrination by her, and for the mother to enroll in and complete a parenting course followed by supervised visitation for the mother. In that motion, the father references the mother as a "pathological liar and gaslighting perjurer."
On January 11, 2023, the Court denied Motion #28 indicating that the issues were a matter for trial.
On February 24, 2023, Mr. B. objected to service on the mother's modification petition and a traverse hearing was scheduled for March 14, 2023, alongside trial on Mr. B.'s petition. Mr. B. was advised to submit a subpoena for the sheriff to testify on March 14, 2023, for the traverse hearing.
On February 27, 2023, the attorney for the children sought to be relieved alleging that [*7]Mr. B. inappropriately crossed the line between professional and personal by questioning the attorney for the children's personal life. [Motion Seq. #29] According to the attorney for the children's affirmation, she was no longer comfortable representing the children based upon Mr. B.'s behavior in which it appeared he was attempting to discredit and intimidate her. Mr. B. submitted a response to the AFC's order to show cause which included the following statements:
"I hope it signifies [AFC's] own atonement and return to G-d, especially since she claims to respect her Jewish roots. . .,"
"The decision to finally leave alone the children intentionally damaged and tortured by [AFC] for over to long years — whether led by feminist ideology which, apparently, ruined her own childless life, by state-funded greed as a permanent AFC fixture in this court. . .is the first decent decision made by [AFC.]"
"[AFC] has been intentionally and insidiously driving a wedge between the children and me. . .in order to the court's/government's bidding, and to secure the gravy train of AFC appointments feeding her largely taxpayer-funded law practice,"
"I vehemently and sternly oppose [AFC's] ultra vires motion to appoint another state-paid agent/saboteur to continue to stir and poison the parent child relationship, in order to promote Title IV-D incentivized parental alienation — feeding Family Court judges, clerks, AFCs, 18Bs, and the rest of the despicable childhoods-crushing machinery insidiously created by federal and state governments."
"[AFC] appears to be a post-menopausal woman, probably in her late 60s-early 70s, likely already aged out of her fertility window."
I hope [AFC] returns to G-d, for forgiveness is His — because what she did to these children — and to countless others — is truly a grave, grave sin."
[AFC] is one of the nepotism-oozing cohort of the court's favorite attorneys. . .who appointed her in a decision lacking any argumentation and reason — as Family Court judges so cavalierly do.
"Any appointment of taxpayer funded lawyer should undergo an adversarial hearing."
Based upon the attorney for the children's order to show cause, this Court relieved the attorney for the children, Rita Kaufman, Esq., and assigned a new attorney for the children, Nicholas Murgolo, Esq.
On March 14, 2023, the father was not present for trial as he sent an e-mail to the Court indicating he was in the hospital and sent a photo of an arm purporting to be Mr. B.'s arm with a hospital bracelet. This Court issued an order directing Mr. B. to provide medical documentation regarding his March 14, 2023 hospitalization and diagnosis. This documentation was never provided to the Court. 
On March 22, 2023, a conference was scheduled to select new trial dates on both parties' modification petitions and to address Mr. B.'s application for a traverse hearing. Mr. B. refused to provide medical documentation regarding his March 14, 2023 hospitalization. Additionally, Mr. B. submitted an answer to the mother's modification petition on March 14, 2023, despite being hospitalized. Lastly, this Court never received a subpoena for the sheriff to testify regarding service. Based upon this information, this Court deemed that Mr. B. waived service and issue was joined on the mother's modification petition. Trial on both petitions were scheduled for May 9, 2023, August 22, 2023, September 12, 2023, September 13, 2023, and September 14, 2023.
On May 9, 2023, trial was scheduled to commence. On the morning of May 9, 2023, Mr. B. sent an e-mail to this Court indicating that he was hospitalized and provided a photo of a hospital bracelet and a photo purporting to be Mr. B.'s foot in a hospital bed. This Court issued an order that Mr. B. was to provide a letter from his treating physician that he was ill and unable to appear in Court. The Court never received documentation regarding Mr. B.'s May 9, 2023 hospitalization. Trial was adjourned to August 22, 2023.
On May 19, 2023, after obtaining permission from this Court on May 9, 2023, to file the motion, the attorney for the children filed an order to show cause seeking an order allowing the children to travel to Israel in the summer. [Motion Seq. #30] Mr. B. submitted oppositional papers [Motion Seq. #31] to the request on June 9, 2023. Mr. B. argued that the matter was res judicata as the issue was previously raised and denied. Mr. B. further asked that the court sanction the AFC for wasting the court and taxpayers' resources, and to award him costs for having to reply to the same "nonsense." The father's papers include the following statements:
"I have never agreed to [AFC's assignment] or to assignment of another parental-authority undermining, subversive AFC whose loyalty is only to getting more lush appointments from the court, let alone non-private, government-paid and controlled one."
"[AFC's] purported insertion between me and the children, therefore, is far from being legitimate or legitimized-any any of his actions on behalf of the small victims of alienation, isolated and brainwashed by constantly shouting and manipulative [Ms. S.] are null and void.
"[AFC] has the chutzpah — or the lack of intelligence. . ."
On May 22, 2023, the father disregarded the June 24, 2022 order and, without permission, filed an order to show cause seeking custody of the children, the mother's incarceration, supervised visits for the mother, and for the mother to complete a parenting course for a missed visit on May 21, 2023. In his papers, the father references the Family Court as: ". . .this useless, ideology-soaked and Marxism/feminism spreading, agenda peddling Family Court — only good at targeting fathers who dare to expose the rot festering among its childless, nepotism-infected judges. . .will do nothing."
On June 9, 2023, this Court denied Motion #31 filed by the AFC seeking for the children to travel to Israel for the summer on the basis that the order that neither children could leave the jurisdiction of the Court remained in effect. The Court also denied Motion #32 on the basis that the mother had provided medical documentation of the child's illness from the child's doctor and a makeup visit was scheduled and took place. The attorney for the children sought sanctions against the father for filing the frivolous motion, however, this Court denied the application.
On June 13, 2023, Mr. B. filed an order to show cause [Motion Seq. #33], disregarding this Court's order and filing without leave of the Court, seeking an order for immediate custody of the children, that the mother be incarcerated for contempt, that the mother not be allowed any contact with the children for a period of three months, and for the mother to enroll and complete a parenting course and subsequently received limited supervised visitation. Mr. B. alleged the child, A.B., brought an iPad to the visit and according to Mr. B., "[the mother] sent the children with a recording device (iPad), obviously instructing our daughter to record me."
On June 14, 2023, as there was no emergent basis to file based upon Mr. B.'s affidavit and exhibits, the Court denied the Motion #33 because the father failed to seek leave of the Court to file the motion. Following the issuance of this order on motion, Mr. B. filed an order to [*8]show cause [Motion Seq. #34], with permission from this Court, seeking an order for immediate custody of the children, that the mother be incarcerated, that the mother not be allowed any contact with the children for a period of three months, and for the mother to enroll and complete a parenting course and subsequently received limited supervised visitation. The order to show cause was scheduled to be heard on June 27, 2023.
On June 26, 2023, the AFC sought permission to file a cross motion [Motion Seq. #35] denying Mr. B.'s relief requested and suspending the father's visits with the children. The AFC noted that Mr. B. frequently misstated the record in his filings, namely, that the AFC was formally admonished for inappropriately discussing the topic of the children traveling outside the jurisdiction, noting concern that that the father "misstates the record solely for his benefit.' Further, the AFC noted that the father made personal attacks on the AFC's professional and personal relationships through frivolous motion practice. In support of the AFC's motion, the AFC stated that A.B. had a disagreement with her father and he subsequently began recording A.B. and taking photos of the child. A.B. reported that she then began recording the father with her school issued iPad whereupon the father aggressively grabbed the iPad and A.B. was crying as a result. The child, P.B., confirmed A.B.'s statements stating that the children spent the visit trying to get the iPad back and that they ultimately called the police after seeking assistance from a Good Samaritan. Based upon the children's wishes to no longer visit, the AFC filed the cross motion.
On June 27, 2023, parties and counsel appeared on the motion in which the mother indicated the iPad was issued by the Department of Education and the child uses the iPad for school purposes. The mother denied sending the child with the iPad for the purpose of recording the visit. The father stated that the child began recording the visit with the iPad and believed that it was at the direction of the mother. According to the attorney for the children, the children reported that the father began recording the visit and the child, A.B., in turn, began recording her. The father then snatched the iPad and the children ran away from the father ultimately reporting the incident to the police. The Court denied the motion indicating that there was no proof that the mother told the children to bring the iPad and subsequently issued a COI to investigate the incident.
On August 15, 2023, Mr. B. filed an order to show cause [Motion Seq. #36] seeking a jury trial and an adjournment of the August 22, 2023 trial date for voir dire and to empanel a jury. Hon. Keith Brown from Richmond County Family Court declined to sign the order to show cause as Mr. B. had not sought leave of the Court to file a motion pursuant to this Court's June 24, 2022, order that no party may file motions absent leave of the court.
On August 18, 2023, Mr. B. filed an order to show cause [Motion Seq. #37] seeking a jury trial and conversion of the August 22, 2023, trial date to a trial ready conference. Hon. Keith Brown declined to sign again, but issued a decision, that there was no basis in law or fact for the relief sought.
On August 22, 2023, the trial was unable to commence as Mr. B. made an oral application for an attorney to be assigned to him. This Court assigned an 18-B panelist to represent Mr. B. on the pending modification petitions before the Court. Trial was scheduled to commence September 12, 2023, and to continue September 13, 2023, and September 14, 2023.
On September 12, 2023, counsel for the father filed a motion [Motion Seq. #38] to be relieved alleging that while he was preparing the case with the father, the father indicated that the attorney was unprepared and that if he were to go forward with trial, he would be committing [*9]malpractice. According to the father's attorney, he believed that the threats of malpractice being raised showed to him that the father would not be accepting his legal advice or strategies for the case. This Court relieved the father's attorney. The father ultimately accepted that his attorney was going to be relieved, however, this Court became concerned with the father categorizing the attorney as part of the "state's Kabul." Based upon the father's statements at the September 12, 2023 appearance, his prior outbursts in court, his explicit distrust of the court system and state appointed attorneys through his extensive motion practice including nine motions for recusal of this Court, recusal of Referee Byun, removal of the mother's attorney and the attorney for the children, his request for an adjournment for every trial date, and a pending malpractice lawsuit against the attorney for the children, this Court deemed that Mr. B. was resorting to manipulation, retaliation, and delay tactics such that he effectively forfeited his right to counsel and was required to proceed pro se.
On September 12, 2023, over the father's objection, trial commenced on the father's petition and testimony was taken from the father.
On September 13, 2023, Mr. B. requested an adjournment because he was unprepared for trial alleging that the Court was "judicially raping" him. The adjournment request was denied as Mr. B. had almost two years to prepare for trial. Mr. B. was advised several times throughout the pendency of this case as well as the September 12, 2023 and September 13, 2023 appearances that the Court would not tolerate his continued disrespect of counsel, the mother, court staff, and this Court. Mr. B. was advised that if he continued with his outburst and insults, that he would be removed from the proceeding and his case would be deemed closed. Trial continued September 13, 2023, with Mr. B.'s testimony.
On September 14, 2023, trial was scheduled to continue with Mr. B.'s testimony. Mr. B. requested an adjournment claiming that he was under extreme duress despite Mr. B. threatening and insulting the Court, court staff, attorneys, and the mother. This Court asked Mr. B. to stop his outbursts at which point Mr. B. indicated "No, no # I am not stopping" and then proceeded to insult this Court's physical appearance in addition to the mother's attorney's physical appearance. The father then proceeded to attack this Court's credibility alluding to speaking with this jurist's family members and insinuating that this jurist was under the influence of alcohol without any basis. The father's offensive remarks continued including the following:
[Referencing the Court] "You chose complete bias, you know that I—repeat as I said—it all compiles to my exposure of you as a childless feminist who is not supposed to be anywhere near making a decision near the children."
[Referencing the mother's attorney] "You call yourself a Jew?"
[Referencing the mother's attorney] "I feel intimidated by Mr. Berliner. He is a large overweight man.
[Referencing the mother's attorney] "This person, this fake Jew, is lying to you. Jews don't lie."
This Court put the matter on recall to allow Mr. B. to compose himself. During the recall, this Court was advised that Mr. B. sought medical attention and Mr. B. left by ambulance. The AFC objected to the adjournment stating the following: "I just would like to correct the record because Mr. B. is a pro se litigant and loves to state inaccuracies, lies, and rankly outright perjurious things to muddy the record. . .His attacks against Your Honor, the personal attacks that he levied, that Your Honor demonstrated great restraint in not removing him from the [*10]courtroom, quite frankly, was a last desperate attempt to delay this proceeding. And now getting to what Your Honor just stated, it is clear to me that Mr. B. knew what he is doing is to delay these proceedings. After his tirade against Your Honor, he demanded a recall. He demanded it. He was walking out of this courtroom before Your Honor even granted the recall. So, for him to go into the hallway and then claim he's ill is a lie." The AFC subsequently made a motion to suspend Mr. B.'s visits pending an update to the father's health which this Court denied. The mother's attorney also objected to the delay in trial and indicated that since Mr. B. was adamant about removing him from the case, he would be asking to be relieved to progress the case along. The mother did not consent to her attorney being relieved from the case, pleading: "It has been three years and I don't want Mr. Berliner to go. I know it's very hard. I was 50 times in this place. . .It needs to end. Only you can stop it. Nobody can stop him. Please make it stop. It's impossible." This Court did not relieve the mother's attorney, but over the mother's attorney and the AFC's objection, the Court allowed Mr. B. another opportunity and adjourned the trial.
On October 11, 2023, a conference was scheduled with all parties and counsel present to select continued trial dates. Mr. B. requested an adjournment of the October 11, 2023, conference date indicating that he was unable to prepare for the conference to select trial dates. This Court denied the request. Trial dates of October 24, 2023, October 27, 2023, October 31, 2023, November 2, 2023, November 3, 2023, November 8, 2023, November 28, 2023, and November 29, 2023, were selected. Mr. B. objected to each date stating that he could not prepare for trial by those dates. The dates remained over Mr. B.'s objection.
On October 24, 2023, trial continued with Mr. B.'s testimony. Mr. B. made an oral application for this Court's recusal which was denied. Mr. B. was advised again during his outburst that if he continued with his language and his behavior, this Court would remove him from the proceeding and his case would be deemed closed. Despite the warning, Mr. B. continued to be defiant after the Court put the matter over for a brief recall for Mr. B. to compose himself to which he stated to this jurist, "You need to compose yourself," "I'll take the five minutes [recess] because I think you need five minutes." The father further stated "This court keeps raping me. I know that you don't like the word, "rape." Maybe you were accused of raping." Following these statements, the father continued his outburst about the court including the following statements:
"This whole court is a farce. This is a circus."
"You feel unsafe? If you feel unsafe, please recuse yourself."
"Your whole Nazi system is corrupt."
"[The mother] uses this court and the proceedings and this whole State's operandi which is completely broken and corrupt, breaking the neck of America on the way to complete communist dictatorship."
"You are all a scam, your forensics, your psychiatrists, your attorneys, your AFCS, your judges. It's all a scam. It is all designed to take the children away, break the neck of America, and nurturing communism."
"You generate false pretenses to take kids from good fathers like myself who fight for over six years just to be a father, to chain them to the mother, justify child support, get Federal funding in order to pay for attorneys like you and suck the money of the state and taxpayers. It is obvious what you are doing here."
On October 26, 2023, the attorney for the children submitted an adjournment request on the basis that he had a death in the family. The October 27, 2023, and October 31, 2023, dates [*11]were vacated as a result.
On November 2, 2023, Mr. B. filed a motion seeking this Court's recusal. The motion was denied. Mr. B. began to delay the continuation of the trial demanding that the attorney for the children reveal who died in his family. He then requested that the mother's attorney be removed from the case and that the attorney for the children be removed alleging everyone in the court system to be corrupt. Mr. B. was advised to proceed with his testimony, or he would be removed from the proceeding. Mr. B. then began to disrespect this Court and began demanding and directing orders at this jurist:
"Control your courtroom."
"Can you pay attention?"
"I will address you the way I want to address you, Ms. McFarland."
Mr. B. continued insulting the attorneys' physical appearances and again insinuated that no one died in the attorney for the children's family. This Court went on five-minute recess to allow Mr. B. to compose himself. During the five-minute recess, this Court was advised that Mr. B. was detained by officers. As a result, the Court could not continue with trial. The mother's attorney, again, objected to the adjournment and requested to proceed noting: "[Mr. B.] refuses to answer questions. He decides when we go on a break. He gets up and leaves. He goes out in the hallway, tries to intimidate people here who are just doing their job, taking pictures, threatening people, calling them names. My application is he absented himself today on purpose. I ask that his petition be dismissed. . .This cannot be an indefinite life sentence for my client." Over the mother's objection, the matter was adjourned for continued trial on November 3, 2023.
On November 3, 2023, Mr. B. filed a motion [Motion Seq. #42], without leave of the Court, seeking recusal of this jurist based upon Mr. B. filing an Article 78 petition against this jurist. The motion was addressed during the November 3, 2023, trial date at which time this Court denied the motion. Trial continued with cross examination of Mr. B. and testimony from the mother.
On November 6, 2023, Mr. B. filed a motion [Motion Seq. #43] seeking transcripts of the proceedings. This motion was deemed as moot as the necessary paperwork had already been provided to Mr. B. and the transcripts were being sent to him based upon his request to the Court's Help Center.
On November 8, 2023, Mr. B. filed a motion [Motion Seq. #44], without leave of the Court, seeking an adjournment of the November 8, 2023, trial date pending the conclusion of his Article 78 petition against this jurist. On this same date, Mr. B. filed a motion [Motion Seq. #45], without leave of the Court, seeking to allow the paternal grandfather to testify via video from Israel for the November 8, 2023, trial date. Mr. B. stated the paternal grandfather would testify to the father's parenting styles and activities the paternal grandfather observed between the father and the children. The motion was addressed on the trial date of November 8, 2023, in which the Court denied Motion #44 as no stay was received from any court. Motion #45 was denied following oral arguments in which Mr. B. indicated that following the issuance of the 2019 Washington Order, the paternal grandfather had not observed the interactions between the father and the children to the present date, thus deeming his testimony irrelevant. Trial proceeded with testimony from M.G., a paternal cousin, who testified to observing the father and the children in Boston, Massachusetts during a visit in or around 2021.
On November 28, 2023, Mr. B. requested permission and subsequently filed a motion [*12][Motion Seq. #46] for immediate change of custody to Mr. B., that the mother not be allowed contact with the children for three months, that the mother enroll and complete a parenting course and subsequently be granted supervised visitation with the children on the basis that the during a visit on November 26, 2023, the father observed the mother's driver side window to be broken. Mr. B. further alleged that the children's nails were dirty and A.B.'s hair was unbrushed, and that the children indicated that only the father is to be present for their visit. On November 28, 2023, based upon a lack of emergency noted in the father's affidavit and exhibits attached and that a trial on the issues had commenced, denied the motion, but did not prevent the father from testifying at trial regarding the issues. The Court continued with trial and testimony was elicited from L.R, P.B.'s counselor in second grade.
On November 29, 2023, Mr. B. submitted an adjournment request because he was experiencing flu-like symptoms and needed to go to the doctor. The request was granted; however, Mr. B. had appeared in person and made an oral application for this Court's recusal. The application for recusal was denied and trial was adjourned to December 20, 2023, and December 21, 2023.
On December 18, 2023, the New York State Office for Children and Family Services filed a motion [Motion Seq. #47] to quash a subpoena submitted by Mr. B. indicating that the Mr. B. failed to comply with the CPLR 2307's request that notice of a subpoena duces tecum for the State's records must be made on at least one day's notice and that Mr. B. improperly served the subpoena upon the State Agency. The motion was scheduled for the next trial date of December 20, 2023.
On December 20, 2023, Mr. B. submitted a letter from his doctor indicating that on December 19, 2023, Mr. B. was diagnosed with a cold and prescribed ibuprofen and could not appear for the selected dates of December 20, 2023, and December 21, 2023. The trial was adjourned to January 18, 2024, January 30, 2024, and January 31, 2024.
On January 18, 2024, trial was scheduled to continue on Mr. B.'s petition. On the morning of trial, Mr. B. submitted a request for an adjournment and submitted documentation that he was diagnosed with a sore throat, prescribed ibuprofen, and could not appear for the trial date. Mr. B. did appear despite his medical note. The adjournment was denied, and Mr. B. was directed to proceed. The mother's attorney raised an issue that Mr. B. was not, in fact, sick on the last trial date of December 21, 2023, as he appeared in criminal court on December 21, 2023. Mr. B. initially denied being in another courthouse on December 21, 2023, before ultimately admitting that he had been in criminal court on December 21, 2023. This Court deemed that Mr. B. was not in fact sick, despite submitting a document to the Court attesting that he was sick. This Court advised that if he was sick, an adjournment request should have been submitted for December 21, 2023, to criminal court as he did for family court. Based upon the information, the Court deemed the action as a dilatory delay tactic and Mr. B. was held in default. The Court reserved decision on whether to proceed on the evidence proffered by Mr. B. or dismiss his petition in its entirety. Mr. B. had another outburst and began yelling to this jurist, "You're lying. You're a Nazi. You're a Nazi, Ms. McFarland." As a result, Mr. B. was removed from the proceeding and the matter was put on a brief recall. During the recall, this Court confirmed with Richmond County Criminal Court that on December 21, 2023, Mr. B. had a court appearance and was present. This Court returned from recall and allowed Mr. B. to return to the courtroom on the condition that he could not have any outbursts in the courtroom. Mr. B. returned to the courtroom with his head down on the table and sought medical assistance. Mr. B. was taken out [*13]of the courthouse by ambulance and this Court proceeded on the mother's modification petition. Trial concluded on January 18, 2024, and in-camera was scheduled with the children on January 26, 2024. 
On January 24, 2024, Mr. B. filed an order to show cause [Motion Seq. #50] seeking to cancel the children's in camera interviews and schedule make up time for a missed visit on January 21, 2024. Mr. B.'s application to cancel the children's in-camera interviews was denied and the Court proceeded with the children's in-camera on January 26, 2024.
On January 26, 2024, the children were produced for an in-camera interview with the Court.
On February 7, 2024, the attorney for the children, with permission, filed an affirmation in opposition to Motion #50 and filed a cross motion [Motion Seq. #51] seeking supervised visits between the children and father. The decision on Motion #50 and #51 will be incorporated with this decision.
In the time this matter was filed on March 10, 2020, to the conclusion of the case, Mr. B. filed over 40 motions including motions for this Court's recusal and immediate transfer of custody. This Court made numerous attempts to expedite the matter and conduct a trial to address the issues especially as it related to Mr. B.'s continued requests for an immediate transfer of custody. Despite that, Mr. B.'s numerous outbursts and continued retaliatory and dilatory tactics as well as his barrage of insults regarding their physical appearances, personal life, and religious faith towards this Court, the attorneys, court staff, and the mother caused protracted delay in having this matter concluded and achieving finality for the children.
During the trial, this Court heard testimony from Mr. B. and Ms. S. as well as L.R., P.B.'s guidance counselor from second grade, and M.G., a paternal cousin. This Court has found Ms. S., Ms. R., and Ms. G.'s testimony to be credible. Based upon the contradictory statements made by Mr. B. and his actions and behaviors observed throughout the trial, Mr. B.'s testimony was not deemed credible.
DISCUSSION
Trial commenced on September 12, 2023, and continued September 13, 2023, September 14, 2023, October 24, 2023, November 2, 2023, November 3, 2023, November 8, 2023, November 28, 2023, and January 18, 2023. Trial concluded on January 18, 2023. The father appeared pro se and the mother appeared with her counsel.
During trial, four exhibits were admitted into evidence, including:
Petitioner's 1: 2018 Washington Parenting Plan
Petitioner's 2: 2019 Washington Parenting Plan
Petitioner's 3: 2019 Washington Final Order and Findings on Objection
Petitioner's 4: Mother's Affidavit
At the outset of this trial several issues were raised which the Court must address before addressing the petition on the merits.
A. Petitioner's Behavior, Actions, and Statements Require Admonishment
As the Court noted during trial, this matter is highly sensitive and emotional for both parties. While understandable that parties' emotions may heighten during such proceedings, this Court must address the manner of the father's statements, his behavior, and his actions. throughout the pendency of these proceedings and the trial namely that this Court has not [*14]provided him with a fair process.
Pursuant to Part 130 of the Rules of the Chief Administrative Judge, the Court may impose sanctions upon a party upon either motion or upon its own initiative for frivolous conduct which includes action undertaken to harass or maliciously injure another:
(a) The court, in its discretion, may award to any party or attorney in any civil action or proceeding before the court, except where prohibited by law, costs in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct as defined in this Part. In addition to or in lieu of awarding costs, the court, in its discretion may impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct as defined in this Part, which shall be payable as provided in section 130-1.3 of this Part. This Part shall not apply to town or village courts, to proceedings in a small claims part of any court, or to proceedings in the Family Court commenced under Article 3, 7 or 8 of the Family Court Act.
(b) The court, as appropriate, may make such award of costs or impose such financial sanctions against either an attorney or a party to the litigation or against both. Where the award or sanction is against an attorney, it may be against the attorney personally or upon a partnership, firm, corporation, government agency, prosecutor's office, legal aid society or public defender's office with which the attorney is associated and that has appeared as attorney of record. The award or sanctions may be imposed upon any attorney appearing in the action or upon a partnership, firm or corporation with which the attorney is associated.
(c) For purposes of this Part, conduct is frivolous if:
(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
(3) it asserts material factual statements that are false.
Frivolous conduct shall include the making of a frivolous motion for costs or sanctions under this section. In determining whether the conduct undertaken was frivolous, the court shall consider, among other issues the (1) circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct; and (2) whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party.
"Offensive and abusive language by attorneys in the guise of zealous advocacy is plainly improper, unprofessional, and unacceptable (see, Annotation, Attorney's Verbal Abuse of Another Attorney as Basis for Disciplinary Action, 87 A.L.R.3d 351 [1978].) See Laddcap Value Partners, LP v Lowenstein Sandler P.C., 18 Misc 3d 1130[A] [Sup Ct, NY County 2007.]; See also, People v Fagan, 104 AD2d 252 [4th Dept 1984] (noting that while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's primary interest in the resolution of civil disputes is that they be settled in a peaceful, orderly, and impartial manner), Blumberg v Carol O'Neil & Assocs., Inc., NYLJ, June 18, 1999 at 26, col 6 [Sup Ct 1999] (imposing sanctions against plaintiff's counsel for "numerous personal, [*15]unprofessional, demeaning attacks" directed at defendant's counsel, both in correspondence and during a deposition.) In addition to the imposition of sanctions, a court has the authority to hold a party in contempt if they engage in "[d]isorderly, contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority" (Judiciary Law § 750[A][1]). See AB.P., v. AN.P., 80 Misc 3d 1222(A)
As detailed in the procedural history of this decision, the father's statements throughout these proceedings towards the mother, counsel, court staff, and this Court have been offensive and borders on abusive. The father's actions, statements, and behaviors exhibited a pattern of intimidation and manipulation which this Court will not tolerate or condone.
Although not taking any action with respect to the father's statements, behavior, and actions, this Court admonishes Mr. B. and directs that in future submissions to the Court, Mr. B. shall comply with the applicable law and the Court's rules as is required of all attorneys and self-represented litigants who appear before the Courts of the State of New York.
B. Petitioner's Discrimination Claims
Throughout these proceedings and his motion practice, Mr. B. has insisted that he has experienced gender-based discrimination by this Court and counsel. The Court has not seen any indicia of any alleged discrimination based upon gender, or otherwise, in any aspect of this action. With respect to the issues of custody of the parties' children, the Court will note that it has long been held that the role of gender in making child custody determinations has no place in current law; custody determinations must be born of gender-neutral precepts in both result and expression (see Linda R. v Richard E., 162 AD2d 48, 53-54 [2d Dept 1990]). See AB.P., v. AN.P., 80 Misc 3d 1222(A)
C. Right to Counsel
The right to counsel is a paramount right of every citizen especially in custody proceedings. "While access to counsel in custodial matters is a right for every New Yorker, a parent's abuse of that right. . .cannot become a tool to forestall justice." Stephanie D. v. Rick D. 142 N.Y.S.3d 783 (Monroe Cty. 2021.) As reflected in the procedural history, the father's right to counsel was at issue during the pendency of the trial and continuously raised despite the Court ruling on the matter. While the Court ruled on this issue during trial, it is important for the Court to detail its ruling in this decision.
When the matter was initiated, Mr. B. had privately retained an attorney. After approximately several months of representing Mr. B., on January 21, 2021, Mr. B.'s former attorney filed a Notice of Consent that the father would be proceeding in this matter pro se. Following this, Mr. B. was advised that he had the right to an attorney, at which point Mr. B. waived his right to counsel.
Mr. B. had ample time between January 21, 2021, and August 22, 2023, to obtain new counsel or to request a court appointed attorney. Instead, Mr. B. initiated motion practice, approximately 33 motions filed, for various relief except for court appointed counsel and waited until the commencement of trial on August 22, 2023, despite numerous previously scheduled trial dates, to request a court appointed attorney.
On August 22, 2023, the morning trial was scheduled to commence, Mr. B. requested a court appointed attorney. The Court appointed an 18-B panelist to represent Mr. B. and advised [*16]all parties and counsel that trial would proceed on the next scheduled date of September 12, 2023, and would not entertain any adjournments.
On September 12, 2023, Mr. B.'s court appointed attorney filed a motion to be relieved as Mr. B.'s counsel noting that Mr. B. had threatened malpractice against his attorney if he proceeded to trial on September 12, 2023. The Court conducted a brief inquiry into counsel's motion to be relieved in which counsel stated, "Our meeting lasted just a little over an hour, because at that point I felt that, beyond the allegations, the threat of malpractice coming up potentially for that, he would not - seemingly it appeared to me that he was not accepting my legal advice and the strategies for the case." Counsel for the father further stated that he "laid out the theory for the case, how we would proceed, what witnesses were necessary or not, and that was met with difficulty." Mr. B. denied threatening his attorney with malpractice but noted he had filed a malpractice lawsuit against the current AFC. Mr. B. stated that his attorney asked him to bring other case materials indicating to Mr. B. that his attorney was not prepared. Mr. B. proceeded to call his attorney part of the "State's Kabul" and requested a "normal, professional, no lying attorney."
The mother's attorney opposed the new appointment of counsel and adjournment on the basis that the matter had been adjourned numerous times and that the father was engaging in delay tactics. The AFC also agreed that the request for an attorney was a delay tactic and opposed an adjournment.
The mother's attorney argued: "Your Honor, the appointing of Mr. Yost was a last desperate move by Mr. B. to have a delay in this case...He has said that he's been his own lawyer for two and a half years. He's ready for trial. We have had multiple trial dates where he didn't show up. He checked himself into the hospital. But he should be ready for trial...He just couldn't do the job because of the mysterious illness that keeps happening on the day of trial. So he is ready for trial. And Your Honor needs to say to him today, call your first witness, case on trial...This cannot continue...He's going to do this with any attorney...He asked for Mr. Yost. He asked for a lawyer from the same Kabul that he claims were all run...He said we are all State paid actors...The court has stopped the children from doing things in life that they like to do, saying we are waiting for a trial. He will never agree to a trial."
The Attorney for the Children noted: "I support what Mr. Berliner said. I had concerns on the last date that this was a tactic by Mr. B. to stall the case. But to be clear, I do believe he deserved the right to have counsel. He had the right to counsel. And clearly it had not worked out. There's no reason why this trial needs to be delayed. Mr. B. represented himself for several years. He shows up to court with photographs and alleged evidence that he claims he's prepared to submit and yet, every time there is a trial date, we are not able to start. My clients deserve finality. I keep saying that and it's the truth. I believe, like Mr. Berliner said, that Mr. B. simply wants this to continue because it's like a crusade for him. He gets to show up for court every day, without presenting evidence, without following the rules of law. And he just says what he wants, and everybody has to listen. It needs to stop. The trial should start today...It's exactly like Mr. Berliner. said, we do it on every case. There is no reason why this case is any different."
With respect to the application for a new attorney to be appointed to represent Mr. B., the Court denied that relief. In a matter involving contested custody, wherein the court declined to appoint an attorney, the Supreme Court of Monroe County noted the law pertaining to court-appointed counsel in custody matters and that the right to an appointed attorney is not unlimited in situations involving misconduct of the party seeking the appointment. See Stephanie D v Rick [*17]D. 142 N.Y.S.3d 783.
It is well established that a defendant may not manipulate the right to counsel for purposes of delaying and disrupting a trial. People v Rosenberg, 58 Misc 3d 1203(A) (Crim Ct 2017), quoting People v Howell, 207 AD2d 412 (2d Dept. 1994.) When it becomes apparent that a defendant is merely seeking to manipulate the court by toying with the right to counsel as a means of delaying the case, the Court is permitted to take appropriate action, even if it means forcing a defendant to proceed pro se. This can sometimes be the only means of advancing a case where the defendant is particularly recalcitrant. See id. While a party is entitled to the right to counsel, a party is not entitled to multiple court appointed attorneys. People v. Howell 207 AD2d 412 (2d Dept. 1994.) In People v Enriquez, 3 NY3d 210, 211 (Ct. of Appeals 2004,) the Court of Appeals held "[in cases where defendants have refused self-representation and restricted the participation of counsel ... defendants hav[e] voluntarily waived the right to the effective assistance of counsel." Id. at 216.
In addition to waiver, New York courts have held that this forfeiture can also apply to a party's right to counsel. In People v. Smith 92 NY2d 516, 521 (Ct. of Appeals 1998), the Court of Appeals noted that there may be situations where "egregious conduct by defendants can lead to a deemed forfeiture of the fundamental right to counsel." In People v. Best, 19 Misc 3d 561 (Crim. Ct. City of New York 2008), counsel for the defendant filed a motion to be relieved as defendant threatened to file a grievance against him for motions which counsel deemed frivolous. Counsel also claimed that the defendant continued to insist that counsel is part of a conspiracy to deprive him of his rights. The court granted the motion finding that the defendant engaged in repeated manipulation and retaliatory tactics and purposely sought to sabotage his relationship, not only with his attorney, but all the attorneys assigned on the matter.
In People v. Lineberger, 282 AD2d 369 (1st Dept. 2001), the appellate division found that the defendant forfeited his right to counsel by unjustifiably refusing the services of, refusing to cooperate, and engaging in abusive comments with competent appointed counsel. Defendant forfeited counsel when he unjustifiably refused the services of, refused to cooperate with, and engaged in abusive conduct toward his competent appointed counsel. In People v. Rosenberg, 58 Misc 3d 1203(a) (Crim. Ct. City of New York 2017), the court had assigned the defendant counsel, however, the defendant expressed dissatisfaction with all court-appointed attorneys and continued to appear pro se. In fact, defendant filed numerous pro se motions before the trial and never once sought appointed counsel during his motion practice. On the date of trial, the defendant requested another court appointed attorney but was denied with the court noting his repeated efforts to sabotage his relationships with each of the five attorneys who represented him, threats to file a complaint with the Grievance Committee against his fifth assigned attorney, repeated manipulation and use of his right of self-representation and his right to assigned counsel was a dilatory tactic designed to delay the prosecution of these matters and to disrupt the orderly administration of justice.
The Court acknowledges a parent's right to counsel, however, that right is limited and may be forfeited if the right is abused. In this instance, the Court determined that due to Mr. B.'s actions and behavior, he forfeited his right to counsel and would not be appointed a new attorney. Mr. B.'s behavior, outlined above, indicates a pattern of manipulation designed to stall the proceedings. Mr. B.'s actions resulted in his attorney requesting to be relieved due to threats of malpractice and an attorney for the children being relieved due to threats of intimidation. Mr. B. has filed grievances with every attorney assigned on this matter including this Court. Mr. B. [*18]has referred to the 18-B panel as the "state's Kabul" and has consistently argued that every court appointed attorney is a state actor conspiring against him. This conduct presented a clear pattern of abuse towards the attorneys and this Court could, not appoint further attorneys for the father.
D. Father's Allegations of Misconduct Against the Mother's Counsel and the Attorney for the Children
Throughout the proceedings, Mr. B. has engaged in a campaign to discredit the assigned attorneys seeking to have mother's attorney as well as the two AFCs assigned on this matter be removed from this case and proceeding.
All three attorneys have continuously advised the Court that they have not engaged in any misconduct in this action and had no conflicts of interest that would permit them from proceeding to represent their respective clients in this action.
There has been no showing of misconduct or ethical violations by either attorney. The fact that the father does not like the either the mother's position or the children's position is not a sufficient reason for either attorney to be removed. Therefore, this Court is not taking any actions as all attorneys have abided by their ethical duties to represent their clients zealously.
E. Petitioner's Willful and Knowing Default
Mr. B.'s bizarre and erratic behavior throughout the proceedings was addressed at numerous points during conferences and during trial. Mr. B. resorted to delay tactics to stall the trial evidenced by the numerous adjournment requests and lack of preparation throughout the trial. Mr. B. failed to submit subpoenas in anticipation of trial on any of the prior scheduled trial dates and did not submit any to the Court until he was forced to proceed and directed to submit subpoenas. In addition to adjournment requests, Mr. B. repeatedly insulted counsel, the mother, court staff, and the Court at every moment including motion practice, on the record, and during trial. The Court notes that most of the Mr. B.'s testimony at trial was directed towards other parties and barely focused on the issue of modification. Mr. B. was allowed some leeway as a pro se litigant during his direct and cross examinations, however, despite being told continuously that the testimony was irrelevant and could not discuss certain topics, Mr. B. disregarded the Court and continued testifying to those topics stating, "I disagree, I can testify."
The Court warned Mr. B. several times that if he continued to speak out of turn, argue with attorneys and the court, insulted attorneys, staff, the mother, and the Court, that he would be removed from the proceeding and considered in default. Mr. B. continued.
Trial was scheduled to continue December 20, 2023, and December 21, 2023. On December 19, 2023, Mr. B. submitted an adjournment request and attached a medical note indicating that he was diagnosed with a cold and prescribed medicine. The December 20, 2023, and December 21, 2023, dates were vacated as a result.
On the next scheduled trial date of January 18, 2023, Mr. B. sent an e-mail to the Court advising that he was sick and requested an adjournment. Mr. B. still appeared on January 18, 2023, where the mother's attorney raised an issue that Mr. B. was in Richmond County Criminal Court on December 21, 2023, a date in which Mr. B. had requested an adjournment for due to illness. Mr. B. confirmed that he was in Criminal Court on the day in question.
In Matter of Bartosz B 187 AD3d 894 (2nd Dept 2020,) the father repeatedly interrupted the proceedings causing the Court to caution that if he continued, he would be removed from the proceeding. He refused to abide by the court's warning by continuing to interrupt and the Court [*19]terminated the call constituting a default by the father. Specifically, the Court noted that the father's application was a tactic to obtain delay and regarded that conclusion of the matter as being important to the children's wellbeing and stability. In Smith v. Bullock 202 AD3d 697 (2nd Dept 2022,) the father was disruptive over the course of the proceedings such that he was removed from the virtual courtroom and the court deemed his conduct to be constitute a knowing and willful default. In Matter of Nyree S. V. Gregory C. 99 AD3d 561 (1st Dept 2012,) the respondent was grossly disrespectful to the Court and when admonished, the father responded in a manner indicating he had no respect for the Court's authority warranting the Court to remove him from the proceeding and his conduct was deemed a knowing and willful default. 
While balancing the interests of justice, the Court allowed Mr. B. an opportunity to have his case heard, especially considering his continuous requests for custody of the children. Mr. B. was offered several opportunities to present his case, but instead, used his time to smear the mother, counsel, and the Court. The latest incident in Mr. B.'s behavior involved lying to the Court about his illness and appearing in another court. It is clear to the Court that Mr. B. has attempted to manipulate and stall the proceedings rather than focus on obtaining finality for the children.
Mr. B. has demonstrated a pattern of disruptive behavior over the course of these proceedings and overall disrespect for the Court, counsel, and parties. At numerous times, Mr. B. expressed his distrust on this Court and repeatedly disregarded directives of this Court to stop engaging in disruptive behavior, at which point, Mr. B. would reply "No."
Based upon the foregoing, Mr. B. is deemed to have constituted a knowing and willful default on this matter, but the Court will consider the evidence proffered by Mr. B. in its decision.
E. Testimony and Evidence on the Modification Petitions
"In order to modify an existing custody or parental access arrangement, there must be a showing of a change in circumstances such that modification is required to protect the best interests of the child." Matter of LaPera v. Restivo, 202 AD3d 788. (2d Dept. 2022.) "The paramount concern when making such a determination is the best interests of the child under the totality of the circumstances." Matter of Cabano v. Petrella 169 AD3d 90. (1st Dept. 2019.)
The Court must look at the totality of the circumstance when looking at the best interests of the children and no one factor is determinative. (See Eschbach v. Eschbach, 56 NY2d at 167, 174 [Ct of App 1982].) The Court may consider factors such as the home environment, financial stability of the parents, each of the parent's ability to promote the child's emotional and intellectual development, and relative fitness of the parents. (See Matter of Lao v. Gonzalez, 130 AD3d 624 [2d Dept 2015]; Bowe v. Robinson, 23 AD3d 555, 557 [2d Dept 2005]; Matter of McVey v. Barnett, 107 AD3d 808 [2d Dept 2013.] When considering all these relevant factors and the totality of the circumstance, the Court must evaluate the testimony, character and sincerity of all the witnesses presented to the Court. (See Eschbach at 173.).
Custody determinations must be based on the best interests of the child and absent a non-emergency situation, a hearing must be held. (See Matter of Jones v. Scaldini, 238 AD2d 422, 656 N.Y.S.2d 370 [2d Dept. 1997.]) The non-custodial parent has the significant burden of demonstrating at such hearing that the child's best interests under the totality of the circumstances warrant a modification of the previously entered custody order (see Friederwitzer v. Friederwitzer, 55 NY2d 89, [Ct. of App. 1982]; Corigliano v. Corigliano, 297 AD2d 328, 746 [*20]N.Y.S.2d 313 [2d Dept. 2002]). In this case, Mr. B. filed several motions seeking a transfer of custody. While the Court attempted to schedule trial to address Mr. B.'s requested relief, Mr. B. was resistant to conducting the trial. After several adjourned trial dates at Mr. B.'s request, the Court commenced trial on September 12, 2023. Not until the October 24, 2023, trial date did Mr. B. submit subpoenas for his trial indicative to this Court that Mr. B. was never prepared to proceed to trial on the previously scheduled dates and that every adjournment request made for trial was indeed a dilatory delay tactic. While Mr. B. is in default, the Court will consider the testimony and evidence elicited on his case when making its decision.
Mr. B. testified that in 2018, Washington Superior Court issued an order of parenting time granting him parental access with the children every other Thursday after school and drop off the children on Monday when school starts. Mr. B. stated that following the issuance of the 2018 order, Ms. S. sought to relocate with the children to New York resulting in the current order of custody and parenting agreement issued by Honorable Samuel Chung in Washington Superior Court in 2019. Both parties testified that by March 2020, the father had relocated to New York.
Mr. B. stated that Ms. S. indicated to him that the parties would return to the 2018 parenting agreement if he moved to New York. According to Mr. B., upon him moving to New York, Ms. S. refused to return to the 2018 order stating that there was already a long-distance agreement and that he would only be seeing the children once a month. Based on this, Mr. B. initiated the current proceedings. Between the time the 2019 Washington order was issued to the time that Mr. B. initiated the current proceedings, both parties testified that Mr. B. consistently visited the children in agreement with the order, at least once per month.
The father stated that once the matter was in court, the previous jurist issued a temporary order of visitation partially returning to the 2018 Washington Order visitation agreement and began having weekend visits with the children. He testified that he traveled frequently with the children during his visitation time including Disney World, Disney Land, Boston, and Upstate New York. Mr. B. detailed these visits and noted no concerns with the children during his visits and it appeared that the visits were going well.
Mr. B. testified that Ms. S. began to isolate the children from him and alienate them from him by disrupting the visits. He noted an example of this when Ms. S. scheduled P.B.'s dance classes which was located over an hour away from the father's residence. He also testified that she scheduled classes for P.B. during the father's parenting time limiting his time with the children.
The mother testified that following a visit at the father's home, both children reported to her that their father locked A.B. in a closet and A.B. was forced to urinate herself. Both parties testified that the incident was reported in Court and Referee Byun suspended the father's weekend visits and ordered supervised visits based on the incident. It is well settled that there is "an exception to the hearsay rule in custody cases involving allegations of abuse and neglect of a child, based on the Legislature's intent to protect children from abuse and neglect as evidenced in Family Ct. Act § 1046(a)(vi)" (See Matter of Rosario WW. v. Ellen WW., 309 AD2d 984 [3d Dept. 2003.]) Although this is not a Family Court Act Article 10 proceeding, the law is well established that hearsay evidence as to allegations of abuse or neglect can be admitted into evidence during a custody proceeding if corroborated by other evidence (see Matter of Hamilton v. Anderson, 143 AD3d at 1087—1088 [3d Dept. 2016]; Matter of Rosario WW. v. Ellen WW., 309 AD2d at 987; Matter of Baxter v. Perico, 288 AD2d 717 [3d Dept. 2001.]) The father stated [*21]that the allegations were fabricated by the mother because ACS closed the case. During cross examination on the topic, the father became non-responsive and uncooperative. When asked if A.B. would be lying if she reported to the father that he dragged her and put her in the closet and shut the door, the father stated "A.B. is a small girl who is completely dependent of her mother who coaches her, tells her lies.." When asked if P.B. is a liar if he reported to his father that he observed him take his sister upstairs and lock her in a closet until she urinated herself, the father stated, "P.B. was equally violated by the mother and after additional brainwashing, he stated something to the effect." According to the mother, the children reported to her that the father stated to the children that they were exaggerating the incident, at another point telling the children that the incident never happened, and at another point stating that it was his way of educating the children. Based upon the testimony and the evidence, it appears that the father believes anything negative the children say about him is a clear sign of coaching, however, anything negative they say about the mother is the truth.
Ms. S. noted that following the Court granting Mr. B. unsupervised time, there were incidents that occurred during the visits such that the children started to report to her that they wanted supervised visitation based upon the father's behavior. Ms. S. stated that the father would record the visits starting from the exchange of the children. According to Ms. S., Mr. B. has recorded her, her vehicle, and her license plate in the presence of the children. The mother stated that when the father begins recording, the children begin yelling, "Stop!" and "What are you doing?" Mr. B. admitted to recording the exchanges as well as during the visits. When asked by the AFC what his observations of the children are when he records them, Mr. B. stated "They are okay with it." When asked if the children had reported to Mr. B. if they were okay with him recording, he was nonresponsive and stated "It is not an issue at all. They are okay with it from my impression." When directed to answer the question as to whether the children had reported to Mr. B. that they were okay with being recorded during the visits, Mr. B., again, became non-responsive stating "What do you mean, have they told me?" "I don't understand what you are saying," and "The children have no issue with me protecting myself." The Court is taking a negative inference from the father's failure to answer the question.
Ms. S. further stated that Mr. B. continued to record the children against their wishes. She testified that after an unsupervised visit with the father at Burger King, A.B. had reported to her mother that her father began recording her during the visits and A.B. took out her iPad, issued by the Department of Education, and began recording her father. The children reported to her that they were kicked out of the restaurant and A.B. was crying. According to the mother, the visit ended with the children running to the police precinct and a police report was filed. Mr. B. admitted that there was an event where A.B. began recording at Burger King. When asked if he recalled recording A.B., Mr. B. stated he did not recall. When asked if he recalled A.B. stating "If you record me, I will record you," Mr. B. stated he did not recall. When asked if he grabbed the iPad from A.B., Mr. B. denied grabbing the iPad but instead "exercised my parental authority" and took the iPad from her. Mr. B. minimized the incident stating it was a "non-event" that was initiated by the mother. He further stated "I took the iPad because she was recording me. . .It was disruptive to me, disruptive to her, disruptive to P.B." When asked if Mr. B. believed the visit was a non-event as he stated, Mr. B. became non-responsive and went on a tirade against the mother and refused to be re-directed. When asked if the children spent the remainder of the visit trying to get the iPad from the father, Mr. B. stated "I don't understand. You are asking very compound questions. Very long." When directed by the Court to answer the [*22]question, Mr. B. stated "This is a long question." Mr. B. was, again, directed to answer the question and was still nonresponsive stating "I took the iPad. It was several months ago. It was a non-event. . .Nothing happened. It was abnormal in the sense why A.B. was trying to film me. Nothing unusual otherwise. . .Again, nothing happened. What are you trying to prove here." Mr. B. then sought a five-minute recess in the middle of his testimony which was denied before Mr. B. ultimately denied that the children spent the remainder of the visit trying to get the iPad back. Mr. B. denied that they were kicked out of Burger King and that A.B. was crying during the visit. When asked if a woman approached A.B. while she was crying, Mr. B. stated he didn't remember before ultimately stating he did not know. When questioned if the children have ever reported being embarrassed by the father, Mr. B. stated "That is not a conversation that takes place." Ms. S. testified that this was not the first incident that the children have left seeking police assistance and that, in fact, many of the visits have ended with the children filing a police report after running away from the visits.
Another incident during the father's parenting time when Mr. B. brought a friend to his visit with puppies. He stated that while it was a great moment for him and the children, A.B. refused to talk about the puppies after the visit indicative to Mr. B. that Ms. S. may have been coaching A.B. Ms. S. testified that the children reported to her that the father brought a woman to the visits who had dogs with her. The children reported to her that the woman began recording them and questioning them. The children stated that they were uncomfortable and ran away when the unknown woman began chasing the children. The visit ended with the children running to the police precinct and filing a police report. Ms. S. reported that based upon the continuous incidents and police reports, the children have reported to her that they no longer wish to visit with their father unless the visits are supervised.
The father alleges that the children's behavior is a result of being coached. He noted that during another visit, he brought a Tesla car because P.B. enjoyed cars. Mr. B. stated that while P.B. enjoyed the Tesla, A.B. would not get in the car indicative to Mr. B. that Ms. S. had more influence on A.B. He reported that any allegation that the children have raised about the visits have been based upon the mother telling the children to lie.
Mr. B. testified that Ms. S. would use the children as messengers and cited a specific incident in 2022 when Mr. B. was on the phone with A.B. According to the father, A.B. asked him whether he was home and when he answered affirmatively, the mother's friend knocked on his door and served him with papers.
The father testified regarding his parenting capabilities noting that he can care for the children when they are sick and take them to the doctor's office. He stated the importance of being equally involved in their lives as their mother. Mr. B. testified that he has been involved in his children's school life, assisting them with homework, and doing crafts together. Mr. B. also testified to the importance of education regarding the children and instilling the idea of critical thinking. Mr. B. did not deny that the children were doing well in school, nor did he deny that the children were healthy.
Mr. B. testified regarding his home and financial stability noting that he lives in Staten Island and currently renting a house with a room for both children. Of note, Mr. B. did admit that he is currently involved in an eviction proceeding. Currently, it appears Mr. B.'s residence is unstable, and it is unknown what his plans are for housing the children should he be evicted and obtain custody of the children. He stated that while he is unemployed, he graduated with two degrees and noted that once he obtains custody of the children, he will be able to resume gainful [*23]employment. Mr. B. alleges that the mother is the cause of his unemployment, but no evidence was put forth aside from the allegation to substantiate the claim that Ms. S. caused him to lose his job. It is unknown to this Court as to why the father's employment hinges upon him obtaining custody of the children.
M.G., a paternal cousin of the father, testified regarding a visit she observed in or around September 20, 2021, when the children and the father stayed with her and her family for a few days in Boston, Massachusetts. Mr. B. spent an inordinate amount of time detailing the one visit and circumventing any relevant information that M.G. may have had to focus on M.G. past and personal life. There were no noted concerns during the visit, and it appeared to this Court that the children enjoyed the visit. Since that time, M.G. reported that she has not seen nor spoken to the children or seen the children with Mr. B. since 2021.
L.R., school counselor at P.S. 35, testified regarding the child P.B. receiving approximately five or six counseling services in or around 2021 for social skills and social awareness. She further testified that the mother terminated the sessions following this but was unaware as to why she terminated the services. Aside from meeting P.B. for a few sessions, Mr. B. was unable to illicit any relevant testimony from L.R. that he indicated he would show through her testimony. In fact, L.R. has not had any contact with P.B. since 2021.
In Lincoln v. Lincoln, the Court of appeals held that, over objection, the Court may interview children in a custody matter in camera, outside the presence of all counsel, to "to obtain a full understanding of the effect of parental differences on the child, as well as an honest expression of the child's desires and attitudes" 24 NY2d 270 at 272 [Ct of App 1969.] A child's detailed and consistent in camera interview coupled with the totality of the testimony of other witnesses and other evidence presented by petitioner may sufficiently corroborate the out-of-court statements of a child (see Matter of Victoria KK. 650 N.Y.S.2d 390 [3d Dept. 1996]; Matter of Jessica G., at 907, 607 N.Y.S.2d 156 [3d Dept. 1994.] On January 24, 2024, the Court conducted a Lincoln Hearing with the children over the father's objection. This Court gave great weight to the children's in-camera testimony.
The Court took judicial notice of all filings on this matter. At the conclusion of trial, motions were filed. The Court has reviewed the affidavits and has taken into consideration the contents of those affidavits.
This Court finds that there was a change in circumstance that would warrant a modification of the 2019 Washington Order in that the father moved to New York from Washington and wanted more visits than allotted in the order.
It is clear to this Court that neither party can effectively communicate with each other for the best interests of the children. Mr. B. entered in evidence the prior 2018 and 2019 Washington Orders and pointed to the fact that there were multiple judicial findings that the children were equally attached to him as they are the mother. However, the testimony adduced at trial, as well as a review of the motion practice, indicates to this Court that the children love their father but that there have been ongoing issues and tension in their relationship, stemming from an incident during Mr. B.'s visits in which he locked the child A.B. in a closet forcing her to urinate herself, which this Court cannot ignore.
An additional issue is that the children are frequently running away from the visits seeking police assistance and that most of the visits have ended in this manner. It appears that Mr. B.'s minimization of the children's feelings and his inability to understand the impact of his behavior and actions have led to the children no longer feeling safe during unsupervised visits. [*24]The father was non-cooperative when discussing the visits and his testimony was self-serving. Of note, Mr. B. finds no issue with recording his children but finds it "abnormal" when his children do it. Further, the Court finds it disturbing that the father has classified the child, P.B.'s, diagnosis of ADHD as "fake" as it further shows his minimization of the children's overall mental wellbeing.
There have been no issues or concerns noted by this Court, based on the testimony and evidence adduced at trial, that there is any parental alienation by the mother. The children are well-cared for in the mother's care that would not call into question the mother's fitness. There is, however, a question of fitness as it relates the father. There continues to be a lack of insight and accountability that continues to stress the relationship between the father and children which causes concern for this Court as it relates to Mr. B.'s erratic behavior. The Court noted these concerns by issuing an order for a mental health evaluation of both parties on April 26, 2023. Ms. S. complied and there were no issues found. Mr. B. refused to comply with the order. According to Mental Health Services, they made outreach to Mr. B. on July 19, 2023, July 20, 2023, October 24, 2023, and December 28, 2023, by e-mail and voicemail.
The father's consistent inability to comply with court orders, including the June 24, 2022, order directing all parties to obtain leave of the Court before filing motions, the April 26, 2023, mental health evaluation, and the inability to comply with court directives as evident by Mr. B.'s disruptive behavior throughout the proceedings is indicative to this Court that the father will not abide by any court orders. Based upon the father's continued denigration of the mother, this Court has no basis to believe that the father would foster a relationship with the children and their mother should custody be transferred to him. Nor does the Court believe Mr. B. would abide by any order of visitation for the mother and the children.
Further, with a previous finding of domestic violence, this Court notes that while it did not litigate the matter in 2018 when the finding was made, it appears that there remains a dynamic of power and control with Mr. B. so often seen in situations involving domestic violence that appear present to this day. Without information regarding Mr. B.'s current mental status, the Court cannot sanction any unsupervised time between Mr. B. and the children, especially considering Mr. B.'s escalating behavior and testimony elicited.
The Court is making a finding of a change in circumstances based upon the father's move from Washington to New York. The Court is also found that it would be in the best interests of the children for sole legal and physical custody to remain with the mother and the father be granted supervised visits by Comprehensive Family Services as well as daily phones/facetime until further order of the Court.
January 24, 2024 Order to Show Cause
On January 24, 2024, Mr. B. filed Motion #50 seeking a make-up visit for a missed visit on January 21, 2024. According to Mr. B.'s motion, on or about January 21, 2024, Mr. B. alleges that Ms. S. deliberately withheld the children from their regular visit. According to Mr. B., he observed the mother and the children walking towards their home.
On January 29, 2024, counsel for the mother filed an affirmation in opposition to Mr. B.'s motion. According to the mother, on or about January 21, 2024, the children refused to go to the visit with their father for their visit. The mother alleges that the children did not want to be subjected to their father recording the visits as well as the father's erratic behavior during visits. Counsel for the mother also filed a cross-motion seeking to suspend the father's visits pending [*25]the completion of a mental health evaluation.
On February 7, 2024, the AFC filed an affirmation in opposition to Mr. B.'s motion and a cross motion for supervised visits between the children and the father. According to the AFC, the children refused to visit with their father on January 21, 2024, based upon the father's escalating behavior during their visits. According to the AFC, because of their refusal, the father brought police to the mother's residence. The AFC further argues that the children have been pleading with their father to stop recording their visits, but he continues to do so despite their pleas. Additionally, the children reported that the father brought a stranger to the visit who was recording the children, causing them to run to the nearest police station because they were afraid of their safety with this individual. Lastly, the AFC argued that they have chosen to remain in the police precinct to prevent their father from continuing with his behavior and conduct.
The Court is granting the AFC's petition as the Court is modifying the 2019 Washington Order for supervised visits between the children and the father. The father's OTSC for a makeup visit is deemed moot.
Findings of Fact and Conclusions of Law
The 2019 Parenting Plan Agreement issued by Hon. Samuel Chung from Washington Superior Court on September 5, 2019, is modified in that the father's visits will be supervised by Comprehensive Family Services at least once a week as long as Comprehensive Family Services can accommodate. Comprehensive Family Services may expand the visitation to supervised sandwiched visitation if and when it is appropriate. Payment to be made pursuant to 722-C.
The mother retains sole legal and physical custody of the children.
The children may travel or go on vacation so long as the mother informs the father at least two weeks in advance of any travel. When the children are traveling, Comprehensive Family Services visits will be paused until the children return. While the children are traveling, the father is to have at least two phone calls/facetime calls with the children. If the children's passports have not been returned to the mother, they are to be returned to the mother within one week of issuance of this decision. The mother may renew the children's passports.
If one child is sick, the sick child may remain home, but the mother must ensure that the child who is not sick is produced for the visit. The father shall have daily phone/facetime contact with the children. The father is directed to complete a comprehensive mental health evaluation and comply with any recommendations set forth. The father is also directed to complete an anger management program.
All prior temporary orders and prior orders are vacated.
This Order goes into effect immediately.
This is the decision and order of the Court.
Dated: February 28, 2024
Staten Island, NY
ENTER:
Hon. Janet L. McFarland, J.F.C.